IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNA TURNER, | : | CIVIL ACTION - LAW |
| | : | |
| Plaintiff, | : | NO:   2:20-cv-804 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PNC FINANCIAL SERVICES GROUP, | : | |
| INC., | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

## COMPLAINT

AND NOW, comes the Plaintiff, Jenna Turner, by and through her counsel, Susan N. Williams, Esquire, and files the herein Complaint, averring as follows.

### I. INTRODUCTION

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964 [42 U.S.C. §§ 2000e et seq.] ("Title VII") and the Pennsylvania Human Relations Act [43 P.S. § 955 et seq.] ("PHRA"). In violation of Title VII and the PHRA, Plaintiff alleges that Defendant discriminated against her on the basis of her sex by creating a hostile work environment on account of her need to pump breast milk, which lead to a constructive discharge.

### II. JURISDICTION AND VENUE

2. This Court is permitted to maintain personal jurisdiction over the Defendant because its contacts with the Commonwealth and this Judicial District are sufficient to meet the minimum requirements necessary to satisfy the notions of fair play and justice established by the United States Supreme Court in *International Shoe Company v. Washington*, 326 U.S. 310 (1945) and its progeny.

3. The United States District Court for the Western District of Pennsylvania has federal question jurisdiction over this case because alleged violations of Title VII arise under the laws of the United States. 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the alleged violations arising under Pennsylvania law. 28 U.S.C. § 1367.

4. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1), (2) as the Defendant resides within the District and a substantial part of the events and occurrences described herein took place within the District.

### III. PARTIES

5. Plaintiff, Jenna Turner, is an adult individual currently residing at 3018 Sea Oats Drive, Long Beach, MS, 39560.

6. Defendant, PNC FINANCIAL SERVICES GROUP, Inc., is a business corporation, incorporated under the laws of the Commonwealth of Pennsylvania, with a business address at One PNC Plaza, 249 Fifth Avenue, Pittsburgh, Allegheny County, Commonwealth of Pennsylvania, 15222.

### IV. FACTUAL BACKGROUND

7. The averments of paragraphs 1 through 6 are incorporated by reference as if more fully set forth herein.

8. Ms. Turner began her employment with Defendant in 2016, as a Sales and Service Associate at PNC's Great Valley branch.

9. On November 11, 2017, she was promoted to a Branch Sales and Service Associate, at PNC's Greensburg Eastgate branch.

10. This was a relatively large and busy branch, staffed by a Branch Manager and eleven non-managerial positions.

11.     During her employment with the Defendant, Ms. Turner was not written up or disciplined in any way for poor performance or any other work-related issue.

12.     On February 28, 2018, Ms. Turner began her maternity leave.

13.     Ms. Turner returned from her maternity leave on June 20, 2018.

14.     Once she returned from leave, she was informed that a Ms. Geraldine Holts was acting Branch Manager.

15.     Plaintiff went to Ms. Holts to speak with her about her needs for expressing breast milk.

16.     Plaintiff had worked at the Eastgate branch of PNC before and after her maternity leave, and was aware of how busy the Branch was.

17.     She reached out to Ms. Holts on her first day back at work to discuss the times that she would be able to take her breaks that would be reasonable for both the Branch and her body.

18.     As this was her second child that she had breast-fed, she was able to schedule when she needed to express, and they settled on 10:45 a.m. and 2:00 p.m.

19.     During this conversation Ms. Turner was told that the bathroom was the only room she could use to express.

20.     PNC maintains a New Mother's Room Policy that provides new mothers with reasonable break times and a private and secure room in which to express milk.

21.     The bathroom was not a private and secure room.

22.     The use of the bathroom was a common occurrence, as a former co-worker, Megan Brown, who Ms. Holts had released from working with PNC Bank while Ms. Holts was Acting Manager, was forced to express in the bathroom as well.

23. Following the conversation with Ms. Holts, Ms. Turner's breaks were written down on the Base Lobby Schedule by the teller lead, Kelly Riggle, so that all the Branch employees were informed, in accordance with the Company Policy.

24. Several weeks after Ms. Turner's return to work, Chari Bradish was hired as the new Bank Manager.

25. Ms. Bradish was managing her old Branch, as well as the Branch where Ms. Turner was employed, so Ms. Bradish's time at Ms. Turner's Branch was limited.

26. Ms. Bradish was also a small business banker, and was seldom at Ms. Turner's Branch, as she had to visit local businesses as part of her job responsibilities.

27. Ms. Holts continued to hold a position of authority because she was in charge of the day-to-day operations of the Branch as Assistant Manager.

28. On June 19, 2018, approximately one month after Ms. Turner returned from maternity leave, a co-worker, Clarissa Peterson, made a remark about how scheduling gets messed up due to Ms. Turner having to take additional breaks.

29. That same day, Ms. Turner told Ms. Bradish about the remark.

30. Ms. Bradish later had a conversation with Ms. Peterson.

31. Following the conversation, Ms. Peterson came to Ms. Turner and apologized, stating "I don't want to lose my job over the comments I made about you."

32. On July 25, 2018, Ms. Turner reported to ERIC about the constant remarks made by Ms. Holts and Ms. Peterson.

33. She also reported that her breaks were not being properly accommodated, because many of her breaks would occur an hour later than the break was scheduled for.

34. This was an issue for Ms. Turner because if she did not empty her breasts regularly or completely, they could become engorged, or too full, which could lead to the development of mastitis.

35. During the first four months that she returned to the Eastgate Branch from her maternity leave, she missed her break to express approximately thirty times by an hour or more.

36. In the month of July, Ms. Turner had a morning meeting with all of her current co-workers and managers to explain to them that pursuant to the provisions of the Fair Labor Standards Act she was allowed to express when needed, and not have to offer an explanation.

37. By this time Ms. Turner was advised by Ms. Bradish to email her and Ms. Holts when she left her desk to express.

38. No other co-workers were required to email the managers when they had to use the restroom or leave their desks.

39. In July 2018, she developed mastitis for which she was prescribed antibiotics.

40. Due to the continued mastitis she lost milk production due to her irregular pumping.

41. On August 12 through August 15, 2018, Ms. Turner was hospitalized with a severe case of mastitis due to her inability to express regularly.

42. During her hospitalization, she was unable to work or be at home with her children.

43. Ms. Turner's development of mastitis on both occasions was a direct and proximate consequence of the conduct of Ms. Holts, who prevented Ms. Turner from expressing regularly.

44. On August 20, 2018, several days after Ms. Turner was discharged from the hospital, Ms. Holts continued to harass Ms. Turner about her need to express.

45. Ms. Holts accused Ms. Turner of "abusing the system."

46. She was also subject to negative comments from co-workers regarding her pumping.

47. She filed an internal complaint with Human Resources regarding her treatment.

48. On August 20, 2018, Ms. Holts asked Ms. Turner to assist a client with a wire transfer.

49. Ms. Turner's break was scheduled at 2 p.m. by which time she had still not been able to express.

50. She declined to assist the client because she needed to express and another co-worker, William Schieffer was not assisting a client.

51. Mr. Schieffer was certified and trained to assist clients with such a task.

52. Ms. Holts then yelled at Ms. Turner in front of co-workers and clients.

53. Ms. Holts barged into Ms. Bradish's office, at which point Ms. Bradish told Ms. Holts to tell Ms. Turner to go and take her break.

54. Ms. Holts told Ms. Bradish that "this was ridiculous."

55. Although Ms. Holts and Ms. Turner initially determined how long a break Ms. Turner needed and set a schedule, on multiple occasions this agreement was not upheld.

56. This resulted in multiple letdowns in front of clients, ultimately causing Ms. Turner to develop mastitis, and not be able to and no longer be able to continue breast-feeding her daughter.

57. Defendant PNC's Employee Expectations Policy and Code of Ethics instructs that failure to comply with the Policy may result in corrective action up to and including termination from employment.

58. Ms. Bradish advised Ms. Turner that she would speak to Mrs. Holts about Ms. Holt's actions.

59. Ms. Bradish also informed Ms. Turner that Human Relations would be involved in her situation; however, Ms. Turner is not aware of the nature and extent of that involvement.

60. Between July 23, 2018 through September 17, 2018, Ms. Turner applied for fourteen open positions.

61. She was not accepted for any of the positions.

62. During the first week of October, 2018, Mrs. Turner advised Ms. Bradish that she was resigning.

63. Ms. Turner resigned due to the treatment she received at work. She suffered from postpartum depression and was having suicidal thoughts.

64. On September 21, 2018, Ms. Turner filed a *Pro Se* Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

65. Ms. Turner continued to update the EEOC on the events that transpired within her workplace, including her constructive discharge in October 2018.

66. She received her Dismissal and Notice of Rights on March 9, 2020.

## V. COUNT 1
## TITLE VII – GENDER DISCRIMINATION

67. The averments of paragraphs 1 through 66 are incorporated by reference as if set forth more fully herein.

68. The Defendant is an employer as defined by Title VII.

69. Ms. Turner has suffered significant emotional distress as a result of the hostile work environment to which she was subjected.

70. The hostile work environment created by the actions of the Defendants and its agents was sufficiently severe or pervasive to alter the conditions of Ms. Turner's employment and create an abusive working environment.

WHEREFORE, Ms. Turner is entitled to affirmative relief as is appropriate under 42 U.S.C. § 2000e-5(g), including but not limited to back pay, front pay, pre and post judgment interest, compensatory damages, punitive damages, reasonable attorney's fees and costs.

## VI. COUNT 2
## PHRA – GENDER DISCRIMINATION

71. The averments of paragraphs 1 through 66 are incorporated by reference as if set forth more fully herein.

72. Claims raised under the PHRA are interpreted in line with claims raised under Title VII. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

73. Accordingly Ms. Turner's claims alleged under Title VII are alleged similarly under the PHRA.

WHEREFORE, Ms. Turner is entitled to affirmative relief in the form of compensatory and punitive damages, as well as fees and costs.

Respectfully Submitted,

*s/ Susan N. Williams, Esq.*
Susan N. Williams, Esquire
Pa I.D. 40077
Williams Law Offices
101 North Main St., Suite 106
Greensburg, PA 15601
(724) 838-8110
(724) 838-8115 (fax)
snwilliams@snwilliamslaw.com