IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JENNA TURNER,

               Plaintiff,

    v.

PNC BANK, N.A.,

               Defendant.

Civil Action No. 2:20-cv-00804-MJH

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and LCvR 56, Defendant PNC Bank, N.A. ("PNC") hereby submits its Brief in Support of Motion for Summary Judgment. The portions of the record to which PNC refers in this Brief are contained in the accompanying Concise Statement of Material Facts Not in Dispute ("SOF") and Appendix.

## INTRODUCTION

Plaintiff Jenna Turner ("Plaintiff") worked for PNC as a Branch Sales and Service Associate ("BSSA") between October 2016 and October 2018 at the Greensburg Eastgate branch ("Branch"). As a BSSA, Plaintiff was responsible for helping customers with a wide variety of issues related to their accounts. During the last four months of her employment, Plaintiff was taking two daily breaks to express breastmilk at work. Plaintiff's Branch Manager, Chari Bradish, and Assistant Branch Manager, Geri Holts, worked with Plaintiff during that time to identify break times that worked for her schedule and for PNC, taking into consideration that the Branch was busy and Plaintiff would need to be flexible in order to meet their customers' needs. Although Plaintiff initially pumped in a private, locking restroom, Ms. Bradish voluntarily provided Plaintiff with her private office for nursing as soon as she learned of it.

During this time, Plaintiff complained on a handful of occasions to Ms. Bradish and to PNC's Employee Relations Information Center ("ERIC") that she was sometimes delayed in taking her breaks at times, and that she was offended by sporadic comments made by her coworkers about her need to take additional breaks.  Plaintiff also reported to Ms. Bradish and ERIC a disagreement she had with Ms. Holts on August 20, 2018.  Plaintiff admits that Ms. Bradish and Employee Relations ("ER") representatives at ERIC addressed the issues with her coworkers as soon as those were brought to their attention, and that, for the most part, her coworkers stopped making comments to her after that.  Indeed, Plaintiff repeatedly told ERIC that she felt fully supported by Ms. Bradish, and that Ms. Bradish was effective in addressing her issues.  Despite the accommodations made by PNC to allow Plaintiff to express milk, as well as Ms. Bradish's prompt attention to her complaints, Plaintiff voluntarily resigned her employment in October 2018 to work at her daughters' daycare.

Plaintiff alleges that PNC created a hostile work environment based on her gender, and that she was constructively discharged as a result of that hostile work environment, in violation of 42 U.S.C. § 2000e, et seq. ("Title VII") and Title 45 PS §§ 951-963, the Pennsylvania Human Relations Act ("PHRA").  Plaintiff's hostile work environment claim fails because she cannot show that the alleged harassment was objectively severe or pervasive.  Her claim relies on her allegation that she was occasionally forced to take her breaks later than they were scheduled, that her coworkers (including Ms. Holts) made sporadic and non-derogatory comments about her breaks, that she had to take her breaks in a restroom, and that she had an altercation with Ms. Holts on August 20 about her refusal to assist a customer.  But no reasonable person would believe that these allegations, even if true, constituted severe or pervasive harassment.  Even if Plaintiff could show the alleged harassment was severe or pervasive, there is no basis for

*respondeat superior* liability for PNC, as all of the conduct Plaintiff complains of was undertaken by Plaintiff's non-supervisory coworkers, and it is undisputed that PNC responded appropriately and timely to all of Plaintiff's complaints.  Finally, Plaintiff's constructive discharge claim fails because she failed to exhaust her administrative remedies with regard to that claim, and in any case, she cannot show that her working conditions were so intolerable that no reasonable person in her position could withstand them.  Indeed, Plaintiff admits that in the month before her resignation, all of her issues had been resolved and properly addressed by PNC management — yet she still chose to resign.  Because there is no genuine issue of material fact as to Plaintiff's claims, PNC is entitled to summary judgment.

## <u>STANDARD OF REVIEW</u>

Summary judgment is proper if the "depositions, documents, . . . affidavits or declarations, . . . admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Applying this standard to the undisputed material facts in this case, it is clear that PNC is entitled to summary judgment on Plaintiff's claims.

**ARGUMENT**

**A.**     **Plaintiff Cannot Establish a Claim of Hostile Work Environment.** [1]

Plaintiff's primary claim is that she was subject to a hostile work environment during the last four months of her employment, which caused her to suffer from mastitis and emotional distress.  Complaint, ECF No. 1, ¶¶ 56, 69-70.  In order to establish a *prima facie* hostile work environment claim, a plaintiff must show: (1) intentional discrimination based on her sex; (2) severe or pervasive conduct; (3) a detrimental effect on the plaintiff; (4) a detrimental effect on a reasonable person in similar circumstances; and (5) the existence of *respondeat superior* liability.  *Chinery v. Am. Airlines,* 778 F. App'x 142, 145 (3d Cir. 2019).  Plaintiff cannot establish the second, fourth, or fifth elements of her *prima facie* claim, and her case must be dismissed.[2]

    1.     <u>Plaintiff Cannot Show That the Alleged Harassment was Objectively Severe or Pervasive.</u>

The standard to prove severe or pervasive harassment is intentionally high, as Title VII is not a "civility statute."  *Oncale v. Sundowner Offshore Serv's Inc.*, 523 U.S. 75, 80 (1998); *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014).  In order to do so, a plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S.

---

[1] Claims under the PHRA are interpreted coextensively with Title VII claims.  *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

[2] It is also questionable whether Plaintiff could establish the first element, that she suffered intentional discrimination <u>based on her sex</u>.  The Third Circuit Court of Appeals has not resolved whether status as a breastfeeding mother is a valid basis for a sex discrimination claim under Title VII.  *Datji v. Penn Community Bank*, CIVIL ACTION NO. 20-1483, 2021 WL 1209835, at *3 n.3 (E.D. Pa. Mar. 31, 2021).  PNC assumes only for the purposes of this Motion that Plaintiff's status as a breastfeeding mother would be covered by Title VII's protections, but does not waive the right to raise that argument in the future.

17, 21 (1993).  In determining whether harassment meets this high standard, the Court should consider the "totality of the circumstances...including the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interfere[d] with [Plaintiff's] work performance."  *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 577 (E.D. Pa. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted); *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006) (stating that "[Title VII] prohibits severe or pervasive harassment; it does not mandate a happy workplace.") (overturned on other grounds). And the Court should consider what is objectively hostile, i.e., what a reasonable person in the same position as Plaintiff would find to be hostile, not just what Plaintiff subjectively believed was hostile.  *Forklift Sys.*, 510 U.S. at 21; *Greer*, 590 F. App'x at 173; *Stewart v. Weis Markets*, 890 F. Supp. 382, 389 (M.D. Pa. 1995) (stating that "[n]either Title VII nor the PHRA is designed to protect the overly sensitive plaintiff.").

The standard for proving severe or pervasive harassment of a breastfeeding employee is high, as evidenced by the many cases in which courts have concluded that the alleged harassment did not meet the standard.  Indeed, courts in this and other Circuits have found no severe or pervasive harassment in similar circumstances to those alleged by Plaintiff, namely that she was not given an acceptable location to express, she was interrupted while she was expressing, and her coworkers sporadically complained of the inconvenience caused by her pumping because they were unable to use the restroom.[3]  *See, e.g., Winder v. TriCounty Med. Equip.*, CIVIL

---

[3] This case is not like *Mercado v. Sugarhouse HSP Gaming, L.P.*, in which the plaintiff claimed

ACTION NO. 18-cv-04016, 2020 WL 4211538, at *8-9 (E.D. Pa. Jul. 23, 2020) (finding that

questions from co-workers about why the plaintiff needed to pump, and being denied room to

pump in, which resulted in her soiling her shirt, did not rise to the level of severe or pervasive

harassment); *Hicks v. City of Tuscaloosa*, Case No. 7:13-cv-02063-TMP, 2015 WL 6123209, at

*12 (N.D. Ala. Oct. 19, 2015) (finding no hostile work environment where, among other things,

the plaintiff alleged that she was forced to be on full duty while pregnant, was written up by her

supervisor, was pressured to take less than 12 weeks of maternity leave, and forced to express

milk in a public locker room); *Falk v. City of Glendale*, No. 12–CV–00925–JLK, 2012 WL

2390556, at *4 (D. Col. Jun. 25, 2012) (finding no hostile work environment when the plaintiff

was unable to take breaks to express milk, leading to three separate breast infections; was

frequently interrupted while taking breaks; and a co-worker made a "moo" noise when the

plaintiff requested a break).

　　In *Newsome v. City of Philadelphia*, 500 F. Supp. 3d 336, 338-39 (E.D. Pa. 2020), the

plaintiff alleged that she had been subjected to a hostile work environment because she was

forced to express in colleagues' offices and the lunchroom, causing her colleagues to frequently

interrupt her pumping by knocking on the door and asking when they could use the room, and to

make comments about her pumping.  The court held that the complained of behavior was not

severe or pervasive because the "[p]laintiff did not plead facts that suggested reactions toward

her pumping needs—although offensive—went beyond inconvenience, impatience, or irritation

at best."  *Id*. at 343.  Similarly, in *Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315, 322-

---

that her co-workers made a number of humiliating comments about her breasts and lactation
status, including asking how big her breasts would get if she could not pump and telling her that
she was "drying up," as well as a "physically threatening" incident with a security guard.  CIVIL
ACTION NO. 18-3641, 2019 WL 3318355, at *6 (E.D. Pa. Jul. 23, 2019).

25 (D. Del. 2019), the plaintiff alleged a hostile work environment based on the fact that her coworkers would enter the office where she was pumping, a coworker peeked into the office and made a squeezing motion while she was pumping, and that the office had an uncovered window and surveillance camera; and because her supervisor and coworkers made comments about her pumping and how it inconvenienced them, then ultimately stopped speaking to her.  The court found that no reasonable jury could find that this harassment was severe and pervasive, stating that "[v]iewed in the light most favorable to [the plaintiff], the circumstances identified by [the plaintiff] establish that she had an unpleasant relationship with her coworkers, and that her coworkers resented her for taking so many breaks to pump."  *Id*. at 334.  And in *Page v. Trustees of University of Pennsylvania*, 222 F. App'x 144, 146-47 (3d Cir. 2007), the Third Circuit Court of Appeals found that the alleged harassment, including that the plaintiff's supervisors refused to allow her to request a "courtesy transport" from her foot patrol to headquarters so she could express milk; that she was interrupted by her supervisor when she was expressing milk; and that her supervisor assigned her insignificant tasks not assigned to non-breastfeeding officers, was not objectively offensive.  The court pointed out that at the time of the plaintiff's resignation, the university was working with her to address her concerns, including giving her the requested breaks and switching her to a patrol route closer to headquarters.  *Id*. at 147.

Plaintiff cannot reasonably argue that the alleged harassment was sufficiently severe or pervasive to alter the terms of her employment.  Plaintiff identifies the following actions taken by her coworkers: 1) being required to pump in a private restroom until August 2018; 2) sometimes having her breaks delayed when she was forced to take a customer or finish a transaction with a customer; 3) having to notify Ms. Holts or Ms. Bradish when leaving to take a break; 4) a few comments by Ms. Holts about Plaintiff not being willing to take customers and

"abusing the system;" 5) an argument with Ms. Holts on August 20, 2018 about taking a customer before her break; 6) sporadic comments by a coworker, Clarissa Peterson, starting a few weeks after she came back from leave, and stopping after Ms. Bradish spoke to her about them, regarding Plaintiff not needing to take a break, and that Plaintiff's breaks were interfering with Ms. Peterson's schedule; and 7) sporadic comments by co-workers about their frustration with Plaintiff's use of the restroom, and eventually being ignored by her co-workers.  SOF, ¶¶ 14, 16, 18, 23, 26, 34, 35, 42, 44.  Even assuming these allegations are true, they do not demonstrate a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Forklift Sys.*, 510 U.S. at 21.

Plaintiff's primary grievances — that her breaks were delayed when she was asked to help customers, and that she pumped in a restroom until August — cannot form the basis of a hostile work environment claim.  *Lampkins*, 383 F. Supp. 3d at 328-29.  Title VII is not an accommodation statute and does not require an employer to provide an employee with time to express milk, or a private location to do so — unless the employer is providing similar accommodations to non-pregnant employees.  *Id.*; *Dudhi v. Temple Health Oaks Lung Center*, CIVIL ACTION No. 18-3514, 2020 WL 996915, at *7 (E.D. Pa. Mar. 2, 2020) (failure to provide accommodation to employee to express milk at work cannot form basis of Title VII claim because she could not show that similarly situated non-breastfeeding employees were treated more favorably than her); *Falk*, 2012 WL 2390556, at *4 (stating that "[t]he Pregnancy Discrimination Act does not require any affirmative accommodations…").  It is undisputed that non-breastfeeding employees at the Branch also had their breaks delayed when they were working with customers, and Plaintiff has not alleged (nor could she) that non-breastfeeding

coworkers were accommodated while she was not.[4]  SOF, ¶ 10.  While PNC may have been

required to provide Plaintiff with a private location and breaks to nurse pursuant to the Fair

Labor Standards Act or other statutes, she has not sued under those statutes, and she should not

be allowed to shoehorn those claims into her hostile work environment claim.  *Lampkins*, 383 F.

Supp. 3d at 329 (stating that "[a]s inadequate as I might personally find the breast-pumping

accommodations [the employer] offered [the plaintiff], the unreasonableness of the

accommodations is not cognizable under Title VII and does not establish a hostile work

environment."); Compl., ECF No. 1.

　　And even if this Court were to consider these allegations as part of Plaintiff's claim, they

do not constitute severe or pervasive harassment because of her gender.  The Branch was busy

and Plaintiff was one of four BSSAs who could assist customers with account-related issues, so

it was reasonable that she would sometimes be delayed at taking her breaks — just like other

employees were sometimes delayed at taking their breaks for the same reason.  SOF, ¶¶ 7, 9, 10.

Customer service is paramount at PNC so all BSSAs were expected to be flexible regarding their

break times.  *Id.*, ¶ 10.  Plaintiff was never forced to miss a break, and she told PNC's Employee

Relations team in July 2018 that her "issues with leaving and expressing milk" had gotten better,

that Ms. Bradish was "very understanding and accommodating" of her need to take breaks, and

that she had been able to take her breaks to pump, but would sometimes have to go "a little later

than planned."  *Id.*, ¶¶ 24, 25.  Plaintiff was treated just like all of the other, non-breastfeeding

BSSAs, and the fact that her breaks may have been delayed does not rise to the level of severe or

pervasive harassment.  Nor were those delays related in any way to her gender or status as a

---

[4] Indeed Plaintiff argues that a colleague, Meghan Brown, expressed milk at work without the
issues Plaintiff identifies.  SOF, ¶ 46.

breastfeeding mother.

Plaintiff's use of the restroom until August 2018 to pump was not severe or pervasive harassment, either.  The restroom was a "single stall" restroom with a lock that afforded Plaintiff privacy and space to express milk.  *Id.*, ¶ 15.  Plaintiff testified that she did not complain about having to pump in the restroom until late August 2018, at which point Ms. Bradish acted immediately to set Plaintiff up in her office to take her breaks, and had blinds and a lock installed to ensure privacy for Plaintiff.[5]  *Id.*, ¶¶ 38, 39.  Finally, the requirement that Plaintiff notify Ms. Holts or Ms. Bradish when she was leaving for her break was driven by business necessity and applied equally to all Branch employees.  *Id.*, ¶ 9.  It was imperative that the lobby manager know which BSSAs were able to help customers at any given time so asking that Plaintiff send a Skype message or call someone to let them know she was going on break was not unreasonable.[6] *Id.*

Nor do Ms. Holts' alleged comments to Plaintiff about her "abusing the system" rise to the level of harassment.[7]  Ms. Holts was understandably frustrated by Plaintiff's admitted unwillingness to help customers when needed because she and Plaintiff had discussed that Plaintiff would need to be flexible about her break times.  *Id.*, ¶¶ 18, 19.  Plaintiff had agreed to be flexible, yet she did not follow-through on that agreement, instead frequently refusing to take customers during the 15-20 minutes before her breaks started (because she claimed she could not

---

[5] Ms. Bradish testified that she did not learn Plaintiff was pumping in the restroom until she noticed Plaintiff entering the restroom on or about August 27 with a chair.  SOF, ¶¶ 36, 37.

[6] To the extent that Plaintiff claims that other coworkers were not required to notify anyone when they took breaks, she admits that a quick restroom break is different than her 15-20 minute pumping break; and that other employees notified Ms. Holts when leaving their desks for longer periods of time (such as when taking personal phone calls).  *Id.*, ¶ 9.

[7] It is worth noting that Plaintiff did not report any of the comments by Ms. Holts to ERIC or in her charge of discrimination, so she could not have thought they were creating an intolerable working environment.  *Id.*, ¶¶ 21, 22, 24, 25, 26, 45.

finish before her scheduled break time), which effectively allowed Plaintiff to be paid for a 20-40 minute period twice per day during which she may not have actually been performing any duties (depending on whether she had finished working with a previous customer).[8]  *Id.*  This unwillingness to help customers before her breaks started also impacted customer service, as the lobby schedule was drafted each day with the assumption that a BSSA would be able to help a customer when they were not on a break, and if Plaintiff was not willing to take a customer, they could end up waiting a long time until another BSSA was available.  *Id.*, ¶¶ 9, 10.  These frustrations came to a head on August 20, 2018 when Ms. Holts had to track Plaintiff down to ask her to help a customer.  *Id.*, ¶ 33.  Plaintiff refused to do so, and the two began arguing on the Branch floor.  *Id.*  The argument ended as soon as they moved into Ms. Bradish's office.  *Id.* ¶ 34.  Ms. Bradish told Plaintiff to take her break and subsequently coached Ms. Holts that she had been unprofessional in yelling at Plaintiff.[9]  Id, ¶ 34, 35.  This two-way disagreement, which lasted just a few minutes and did not involve any egregious insults or personal comments, is not the type of one-time severe "harassment" that creates a hostile work environment.  *See Kidd v. Com. Of Pennsylvania*, 37 F. App'x 588, 593 (3d Cir. 2002) (holding that supervisor calling the plaintiff a "bitch" on one occasion in midst of an argument was not harassment).

Finally, the comments by Plaintiff's other coworkers are the sort of "simple teasing [and] offhand comments" that the United States Supreme Court has stated do not create a hostile

---

[8] Not only did Plaintiff acknowledge that she refused to assist customers 15-20 minutes before her breaks, she testified that she felt she should not have to accommodate other people's schedules.  SOF, ¶ 19.

[9] Plaintiff may argue that there is a dispute of fact as to whether Ms. Bradish coached Ms. Holts regarding this incident, but that is incorrect.  While Ms. Holts did not <u>feel</u> that she had been counseled, Ms. Bradish testified unequivocally that she had done so, and she reported that coaching contemporaneously to ERIC.  SOF, ¶ 35.  There is no dispute that Ms. Bradish addressed Ms. Holts' conduct after the August 20, 2018 argument and that, after this feedback, Ms. Holts did not engage in any other alleged harassing conduct.  *Id.*

work environment.  *Faragher*, 524 U.S. at 788.  Plaintiff claims that Ms. Peterson commented that she was taking "too long" to take her breaks, that she was milking the system, and that she needed to let Ms. Peterson know when she was going on break.  SOF, ¶¶ 23, 24.  Ms. Peterson could not have been making comments for more than two or three weeks, as Plaintiff claims they started "a few weeks" after she returned from leave on June 20, and she acknowledges that they were addressed by the time she called ERIC on July 19, 2018.  *Id.*, ¶¶ 23, 28.  Plaintiff only reported one comment by Ms. Peterson to ERIC (when Ms. Peterson told Plaintiff "just tell me when I can go on break"), and Plaintiff admitted that Ms. Bradish immediately addressed the issue with Ms. Peterson, who apologized to Plaintiff.  *Id.*, ¶¶ 24, 27, 28.  Plaintiff did not report the comments allegedly made by Kelly Riggle and William Scheibler, and she acknowledges that they stopped making comments as soon as she asked them to stop.[10]  *Id.*, ¶ 22.  Finally, while Plaintiff claims to have been upset that her coworkers interrupted and questioned her need to take breaks, she also admits that the Branch employees were all watching each other, and that it was not a team environment, and therefore she cannot reasonably argue that the comments were directed at her <u>because of</u> her gender or need to express milk.  *Id.*, ¶ 8.

This is not a case where the employee is subject to a constant barrage of abusive comments or physically threatening conduct.  At worst, what Plaintiff alleges is a busy workplace driven by the need to service customers; a Branch Manager who accommodated Plaintiff's needs and promptly addressed Plaintiff's complaints; and coworkers frustrated that Plaintiff was inflexible and unwilling to be a team player to assist customers.  Plaintiff's

---

[10] The alleged "silent treatment" given to Plaintiff near the end of her employment did not create a hostile work environment, either.  *See Lampkins*, 383 F. Supp. 3d at 327 (stating that "regardless of Lampkins' subjective feelings, Bo's subsequent silence would not detrimentally affect a reasonable person in Lampkins' circumstances, and it does not amount to the type of abusive behavior required to sustain a hostile work environment claim.").

allegations fall far short of showing that the alleged harassment was severe or pervasive.

                  2.      Plaintiff Cannot Establish A Basis for *Respondeat Superior* Liability.

Even if Plaintiff could establish that the alleged harassment was objectively severe or pervasive (which she cannot), she cannot show that PNC should be held liable for it. The key question in determining whether an employer should be held liable for a hostile work environment is whether the alleged harasser was a supervisor or coworker. *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). If the harassing employee is a coworker, the employer is liable only if it was "negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the harasser is a supervisor <u>and</u> if the harassment culminated in a tangible employment action, such as demotion or termination, the employer is held strictly liable. *Id.* If the plaintiff did not suffer from a tangible employment action, the company may avoid liability via the *Faragher-Ellerth* affirmative defense by showing that "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998)). Plaintiff cannot establish that PNC should be held liable for any alleged harassment.

                  **a.      Plaintiff's Alleged Harassers were Not Supervisors.**

Plaintiff wrongly argues that Ms. Holts was a supervisor, but the United States Supreme Court's decision in *Vance v. Ball State* negates her argument. *Id.* The Court held that an individual is a "supervisor" in a Title VII harassment claim "only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

benefits.'" *Id.* at 431 (quoting *Ellerth*, 524 U.S. at 761). The Court expressly rejected a "second category" of supervisors like Ms. Holts who only have the ability to direct or lead their coworkers' labor, stating that "[t]he ability to direct another employee's tasks is simply not sufficient" to warrant the title "supervisor" for purposes of a Title VII hostile work environment claim. *Id.* at 432. The question of whether an individual is a supervisor can generally be resolved as a question of law. *Id.* at 443.

Courts interpreting *Vance* have made clear that an employee who supervises co-workers, conducts training, and manages coworkers' day-to day activities is not a supervisor if they do not have the power to take tangible employment actions. *See Morrow v. Kroger Limited Partnership*, 681 F. App'x 377, 380 (5th Cir. 2017) (finding that department manager not a "supervisor" because while he had some administrative responsibilities such as scheduling and filling out performance evaluations, he could not take a tangible employment action); *Equal Employment Opportunity Commission v. AutoZone, Inc.*, 692 F. App'x 280, 283-84 (6th Cir. 2017) (stating that store manager who could initiate disciplinary process and recommend demotion or promotion not a supervisor because he could not hire, fire, demote, promote, or discipline employees); *Irvins v. Penn. Dep't of Corrections - State Correctional Institute at Graterford*, CIVIL ACTION NO. 17-5777, 2019 WL 653092, at *9 (E.D. Pa. Feb. 15, 2019) (stating that fact that employee trained plaintiff did not make him a supervisor); *Berger v. PA Dept. of Transportation*, No. 5:16-cv-06557, 2018 WL 2943963, at *10 (E.D. Pa. Jun. 13, 2018) (holding that foreman was not a supervisor, even though he was responsible for managing the operators and coordinating relevant projects); *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 696 (E.D. Pa. 2016) (finding that training and supervising other staff members not sufficient to make one a supervisor under Title VII).

It is clear that Ms. Holts is not a supervisor under this standard.  Ms. Bradish testified that as the Branch Manager, she was solely responsible for hiring, firing, disciplining, and performance managing employees at the Branch.  SOF, ¶ 3.  Ms. Holts confirmed this, stating that she did not have the power to sign off on, or issue, discipline to employees.  *Id.*, ¶ 5.  Ms. Holts' job was to ensure that customers' needs were met in an efficient matter, and she did so by providing real-time coaching to employees and addressing customer concerns.[11]  *Id.*, ¶ 4.  Ms. Bradish regularly met with both Ms. Holts and Lead Teller, Kelly Riggle, to discuss Branch operations (including any employee concerns), but Ms. Bradish — who was onsite and interacted with employees on a daily basis — made all disciplinary and performance management decisions herself.[12]  *Id.*, ¶ 5; *AutoZone, Inc.*, 692 F. App'x at 283 (district manager was onsite at least once a week, actively participated in management, interacted with employees, and did not "blindly delegate" his management duties to store manager).

The fact that Ms. Bradish was not onsite full-time before her mid-July start date does not change the fact that she was the Branch Manager during the entire relevant time period, and does not transform Ms. Holts into a "supervisor" under the relevant standard during that time.  Ms. Bradish testified that even before her "official" start date of July 9, she spent time at the Branch in a management role.  SOF, ¶¶ 11, 12.  After July 9, Ms. Bradish spent time at the Branch and her previous branch, but testified that she was onsite at Greensburg Eastgate at least four days a week.  *Id.*, ¶ 12.  This is not a case like the exception articulated in *Vance*, where the supervisor

---

[11] Lead Teller Kelly Riggle, not Ms. Holts, was responsible for creating the weekly Branch schedule, which was reviewed and approved by Ms. Bradish.  SOF, ¶ 9.

[12] Ms. Bradish testified that she partnered with Employee Relations for all disciplinary, performance management, and termination decisions, pursuant to PNC policy.  *Id.*, ¶ 3.  The fact that she sought advice from a human resources partner does not change the fact that she was the ultimate decisionmaker with regard to all tangible employment actions at the Branch.  *Id.*

was offsite and an the onsite employee was vested with the power to recommend tangible

employment actions.  570 U.S. at 447.  Contrary to Plaintiff's speculative and unsupported

assertion, Ms. Holts was never given temporary "acting Branch Manager" job duties —including

the power to hire, fire, discipline, or performance manage employees — and she was clearly not

a supervisor.  SOF, ¶ 12.

> **b.**    **Plaintiff Cannot Establish that PNC Failed to Provide a
> Method for Reporting or Failed to take Prompt Remedial
> Action.**

Because all of the alleged harassment was by non-supervisory coworkers, in order to

show that PNC is liable, Plaintiff "must demonstrate that the employer was negligent or reckless

in failing to train, discipline, fire or take remedial action upon notice of harassment."  *Bumbarger*

*v. New Enter. Stone & Lime Co., Inc.*, 170 F. Supp. 3d 801, 838 (W.D. Pa. 2016) (citations and

internal quotation marks omitted).  She can do so only by showing that PNC "failed to provide a

reasonable avenue for complaint" or, alternatively, that PNC "knew or should have known of the

harassment and failed to take prompt remedial action."  *Id.*  "[A]n employer knew or should have

known about workplace [] harassment if <u>management-level</u> employees had actual or constructive

knowledge about the existence of a [] hostile environment."[13]  *Huston*, 568 F.3d at 105 (internal

citations omitted) (emphasis in original).  "Prompt remedial action" is conduct "reasonably

calculated to prevent further harassment," even if it does not effectively end the harassment.

*Bumbarger*, 170 F. Supp. 3d at 838; *Peace–Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir.

---

[13] Management level employees are those with the power to take tangible employment actions, defined as "an employee in the governing body of an entity, as opposed to merely a supervisory employee in the labor force."  *Huston*, 568 F.3d at 108. "[T]o the extent that ... a supervisor does not have a mandate generally to regulate the workplace environment, that supervisor does not qualify as management level."  *Id.*  As discussed above, Ms. Holts did not have the authority to take any tangible employment actions, and her purported knowledge of any harassment would not be imputed to PNC.

2010) (citing *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006)).  "An effective grievance

procedure—one that is known to the victim and that timely stops the harassment—shields the

employer from Title VII liability for a hostile environment."  *Bouton v. BMW of N. Am., Inc.*, 29

F.3d 103, 110 (3d Cir. 1994).

      Plaintiff cannot show either that PNC failed to provide a "reasonable avenue for

complaint," or that it failed to take prompt remedial action of any known harassment.  PNC

maintains a Bias and Harassment Policy that details five avenues for reporting harassment and

Plaintiff was clearly aware of those options, as she received a copy of that policy, contacted

ERIC and allegedly reported the alleged harassment to Ms. Bradish.  SOF, ¶ 1.  Additionally,

once management-level employees of PNC became aware of the alleged harassment, they took

prompt and remedial action.  Plaintiff admits that Ms. Bradish acted promptly to address

comments by Ms. Peterson, Ms. Holts, and other coworkers as soon as Plaintiff reported them.[14]

*Id.*, ¶¶ 21, 24, 25, 28, 34. 35.  Ms. Bradish coached Ms. Holts about the August 20, 2018 incident

and took immediate action to set up her office for Plaintiff to express milk as soon as she learned

that Plaintiff was using the restroom.[15]  *Id.*, ¶¶ 34, 35, 39.  Plaintiff herself told ERIC on multiple

occasions that Ms. Bradish was addressing her concerns, and she cannot now claim otherwise.

*Id.*, ¶ 21, 25, 26.

---

[14] Plaintiff testified vaguely that toward the end of her employment, she told Ms. Bradish that
Ms. Holts was delaying her breaks.  SOF, ¶ 40.  Plaintiff admits that she made these comments
"in passing," and Ms. Bradish testified that she did not perceive Plaintiff's comments about
running late to her breaks to be complaints.  *Id.*, ¶¶ 40, 41.  In any case, it would not make sense
that Ms. Bradish, who Plaintiff admits was supportive and addressed every other one of her
concerns, would have willfully ignored Plaintiff's alleged complaints about her break times.
[15] Plaintiff claims she told Ms. Bradish that being required to pump in the restroom was illegal,
while Ms. Bradish testified that she saw Plaintiff moving a chair into the restroom and decided to
address the issue.  *Id.*, ¶¶ 36, 37, 38.  Either way, it is undisputed that Ms. Bradish acted
promptly to address the situation.

PNC's Employee Relations team addressed all of the concerns Plaintiff raised in her calls, as well.  During her initial call on July 12, Plaintiff told the ER Consultant that Ms. Holts was asking to her to "take one more customer" before taking her break, and would comment on the length of her breaks when she returned; and that a few of her friends had joked with her about her pumping.  *Id.*, ¶ 21.  But Plaintiff also told the ER Consultant that Ms. Bradish was addressing the issues, that she "just wanted to make sure it was on the record and documented after her manager's discussion," and she was told to call back if things did not improve.  *Id.*  Plaintiff never called ERIC again to report issues taking her breaks or comments by Ms. Holts, and indeed when she called on July 19, she told ERIC that the pumping issues had actually improved, thanks to Ms. Bradish.  *Id.*, ¶¶ 24, 25.  Plaintiff reported during the July 19 call that Ms. Peterson had made a comment about Plaintiff's breaks interfering with Ms. Peterson's schedule, but she told Ms. Baum that Ms. Bradish had already addressed the issue, so Ms. Baum closed the call.[16]  *Id.*, ¶ 25.  Notably, Plaintiff did not report during either of those calls that Ms. Holts was harassing her or creating a hostile work environment.  *Id.*, ¶¶ 22, 26.  Plaintiff called ERIC for the last time on August 20 to report her argument with Ms. Holts.  *Id.*, ¶ 35.  Ms. Baum spoke with Ms. Bradish, who stated that she had coached Ms. Holts about her professionalism, so Ms. Baum closed the case because she believed that was an appropriate response.  *Id.*  PNC's ER Consultants acted appropriately to address the concerns Plaintiff reported and Plaintiff cannot show that PNC did not take prompt remedial action to reasonably end the alleged harassment.

---

[16] Plaintiff also told ERIC that Ms. Bradish had <u>encouraged</u> her to call ERIC to report her concerns.  SOF, ¶ 25.

        c.       **Even if the Court Finds that Ms. Holts was a Supervisor, PNC Took Reasonable Care to Address Any Alleged Harassment and Plaintiff Failed to Take Advantage of the Reporting Avenues Available to Her.**

Finally, even if the Court were to find that Ms. Holts was a "supervisor" under *Vance*, PNC can avoid liability by showing that it "exercised reasonable care to prevent and correct promptly any [harassment]", and that Plaintiff unreasonably "failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[17] *Ellerth*, 524 U.S. at 765. An employer can establish the second element by showing that the employee knew about its methods for reporting harassment but failed to use them do to so. *Lauterborn v. R&T Mechanical, Inc.*, 274 F. App'x 137, 139 (3d Cir. 2008).

As discussed above, PNC exercised reasonable care to prevent and correct any harassing behavior. PNC maintains a Bias and Harassment policy that provides a number of methods for reporting violations, and Plaintiff was clearly aware of it as she called ERIC three times in July and August 2018. SOF, ¶ 1. The ER Consultants addressed the issues that Plaintiff presented to them. *Id.*, ¶¶ 24, 25, 26, 35. Similarly, Plaintiff admits that Ms. Bradish promptly addressed all issues that she reported to her, and that she felt Ms. Bradish was supportive during her employment. *Id.*, ¶¶ 21, 24, 25, 28, 34, 35, 41, 43.

To the extent that Plaintiff claims PNC failed to address the alleged comments by Ms. Holts, her claim is precluded because she failed to take advantage of the reporting mechanisms available to her. Plaintiff did not tell ERIC during either of the July 2018 calls that Ms. Holts

---

[17] PNC cannot be held strictly liable for any alleged harassment because Ms. Holts did not take a "tangible employment action" against Plaintiff. Constructive discharge is a "tangible employment action" only when precipitated by a "supervisor's official act." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 140-41 (2004); *Vance*, 570 US at 762 (a tangible employment action requires some sort of "official act of the enterprise, a company act."). Plaintiff has not alleged that Ms. Holts or any other supervisors took an "official act" against her, so she cannot show that she suffered from a tangible employment action.

was harassing her or otherwise creating a hostile work environment.  *Id.*, ¶¶ 22, 25.  The only

mention of comments by Ms. Holts was during the July 12 call, when Plaintiff stated that Ms.

Holts would  state when Plaintiff came back breaks that she had been gone for "15 or 20

minutes."  *Id.*, ¶ 21.  These statements fall far short of a report of harassment, and even if they

were sufficient to put ERIC on notice of harassment, Plaintiff subsequently assured the ER

Consultant that Ms. Bradish was addressing the issue.  *Id.*.  On July 19, she told ERIC that the

issues with pumping had improved, and all of her complaints were about Ms. Peterson (and she

admits that Ms. Bradish addressed those issues).  *Id.*, ¶¶ 24, 25.  And while Plaintiff called ERIC

to report the August 20 incident, it is undisputed that Ms. Bradish addressed that issue by

coaching Ms. Holts, and Plaintiff never reported to anyone else that Ms. Holts was harassing her.

*Id.*, ¶ 35.

Plaintiff acknowledges that the great majority of her complaints were addressed by late

August 2018, primarily due to Ms. Bradish immediately resolving her concerns upon learning of

them.  *Id.*, ¶¶ 21, 24, 25, 28, 34, 35, 41, 43.  And to the extent that Plaintiff claims there

continued to be issues after that time, she did not call ERIC or complain to Ms. Bradish (or

anyone else) of further harassment.  *Id.*, ¶¶ 40, 41, 44.  If the conduct by Ms. Holts was so

severe, Plaintiff had an obligation to report it to someone at PNC who could address the issue.

She failed to do so, despite knowledge of multiple avenues to report concerns; as a result, PNC is

entitled to the affirmative defense set forth in *Ellerth*, and summary judgment is proper.

**C.**     **<u>Plaintiff Cannot Establish a Claim of Constructive Discharge.</u>**

Plaintiff also alleges that she was constructively discharged from her position at PNC.

Her claim should be dismissed because she failed to exhaust her administrative remedies, and in

any case, she cannot meet the high burden necessary to show that she had no choice but to resign.

        1.    <u>Plaintiff Failed to Exhaust Her Administrative Remedies With Regard to Her Constructive Discharge Claim.</u>

Before a plaintiff may file a claim under Title VII or the PHRA, she must first file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") or Pennsylvania Human Relations Commission ("PHRC") and receive a notice of right to sue from one of the agencies. *Anjelino v. New York Times Co*., 200 F.3d 73, 93 (3d Cir. 1999) (discussing Title VII exhaustion requirement); *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001) (discussing PHRA exhaustion requirement). The ensuing lawsuit must be limited to claims that were within the scope of the administrative charge. *Williams v. East Orange Community Charter School*, 396 F. App'x 895, 897 (3d Cir. 2010). A constructive discharge is a "discrete act" for which a plaintiff must file a timely charge, and failure to do so precludes her from proceeding with a lawsuit on that basis. *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *McCall v. Butler Health System/Butler Memorial Hosp.*, Civil Action No. 13–130, 2013 WL 6253417, at *8 (W.D. Pa. Dec. 4, 2013) (holding that the plaintiff failed to exhaust his administrative remedies when he did not file a timely charge related to his constructive discharge); *Warsavage v. 1 & 1 Internet, Inc.*, CIVIL ACTION NO. 17-5104, 2018 WL 2363605, at *4 (E.D. Pa. May 24, 2018) (stating that "[l]ike wrongful termination, constructive discharge as a discrete act requires the complainant to file a specific charge of discrimination.).

Plaintiff filed a charge of discrimination on September 21, 2018, alleging that she was denied the right to pump when she needed to, and detailing the August 20, 2018 disagreement with Ms. Holts. SOF, ¶ 45. Plaintiff did not allege in her charge that she had been

constructively discharged, nor did she amend her charge after her resignation to include a constructive discharge claim.  *Id.*  And there is no evidence that EEOC investigated whether Plaintiff had been constructively discharged, as that claim is not mentioned at all in the detailed dismissal letter issued by EEOC.  *Id.*  Plaintiff failed to exhaust her administrative remedies with regard to her constructive discharge claim, and it should be dismissed.

2.    Plaintiff Cannot Show that her Working Conditions Were So Intolerable that They Would Force a Reasonable Person to Resign.

Assuming *arguendo* that this Court finds that Plaintiff properly exhausted her administrative remedies with regard to her constructive discharge claim, Plaintiff still cannot meet the high burden of showing that she was constructively discharged.  "To establish a constructive discharge, [a plaintiff] must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013); *see also Suders*, 542 U.S. at 139 (holding that in order to establish constructive discharge, the plaintiff "must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response").  The test is an objective one, and "an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge."  *Mandel*, 706 F.3d at 169.  The Third Circuit Court of Appeals has articulated the following factors to consider in determining whether an employee can establish a constructive discharge claim: whether the employer (1) "threatened [the employee] with discharge" or "urge[d] or suggest[ed] that she resign or retire," (2) "demote[d] her," (3) "reduce[d] her pay or benefits," (4) "involuntarily transferred [her] to a less desirable position," (5) altered her "job responsibilities," or (6) gave "unsatisfactory job evaluations."  *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502–03 (3d Cir. 2010) (alterations in original) (citations omitted).

Plaintiff falls far short of establishing that a reasonable person would have had no choice but to resign in her position.  Plaintiff acknowledges that the great majority of her complaints (including comments by coworkers, her pumping location, the timing of her breaks, and the confrontation with Ms. Holts) had been addressed by late August 2018, and that she did not complain after that.  SOF, ¶ 44.  She testified that she "felt like a black sheep" because her coworkers were not as friendly with her as she would have liked, and she was "not excited" to go to work because of that.  *Id.*  But Plaintiff also testified that all of the Branch employees were unfriendly toward each other and out for themselves, and that the Branch wasn't a particularly "friendly" place to work.  SOF, ¶ 8.  Plaintiff's subjective feelings that her workplace was not as welcoming and supportive as she would have liked it to be, are not sufficient to create an intolerable working environment.[18]

3.    Plaintiff Did Not Give PNC an Opportunity to Remedy the Alleged "Intolerable Working Conditions."

Finally, even if Plaintiff could show that she had no choice but to resign due to "abusive working conditions," PNC has shown that it had an accessible and effective policy for reporting the harassment, and that Plaintiff unreasonably failed to take advantage of the system.  *Suders*, 542 U.S. at 152.  As discussed above, PNC has several methods for reporting harassment or hostile work environment, of which Plaintiff was well aware.  SOF, ¶ 1.  Yet between August 20, 2018 and her resignation on September 21, 2018, she did not report any comments or actions by Ms. Holts or any other employees that would constitute harassment.  *Id.*, ¶¶ 40, 41, 44.  She stated that she mentioned in passing to Ms. Bradish that she was running late for her breaks on occasion, but that did not rise to the level of a complaint that would warrant action by Ms.

---

[18] Plaintiff told Ms. Bradish that she would be leaving in any case due to her husband's transfer, and she began working immediately at KinderCare, where her daughters attended daycare and she received a significant tuition discount.  SOF, ¶¶ 29, 30, 43.

Bradish.  *Id.*, ¶¶ 40, 41.  Indeed, all of Plaintiff's communications to Ms. Bradish in August and September 2018 regarding her desire to leave the Branch revolved around the fact that Plaintiff's husband was being transferred in approximately 6 months, and could not maintain her job.  *Id.*, ¶¶ 29, 30.  She also told Ms. Bradish that the new position would give her tuition discounts for her daughters' daycare.  *Id.*, ¶ 43.  Plaintiff did not call ERIC or report to anyone in management the alleged harassment that she claims led to her resignation, and PNC is therefore entitled to summary judgment on Plaintiff's constructive discharge claim.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above and based on the undisputed material facts, Defendant PNC Bank, N.A. respectfully requests that the Court grant summary judgment in its favor and dismiss Plaintiff's Complaint in its entirety, with prejudice.

Dated: October 4, 2021                    Respectfully submitted,

                                          PNC BANK, N.A.


                                   By: */s/ Julia H. Pozo*
                                          Erica L. Yohe
                                          PA I.D. #89934
                                          SEYFARTH SHAW LLP
                                          233 South Wacker Dr.
                                          Suite 8000
                                          Chicago, IL 60606
                                          Tel: (312) 460-5148
                                          eyohe@seyfarth.com

                                          Esteban Shardonofsky (admitted *pro hac vice*)
                                          SEYFARTH SHAW LLP
                                          700 Milam Street
                                          Suite 1400
                                          Houston, Texas  77002-2812
                                          Tel:  (713) 225-2300
                                          sshardonofsky@seyfarth.com

                                          Julia H. Pozo (admitted *pro hac vice*)
                                          SEYFARTH SHAW LLP
                                          1075 Peachtree Street, N.E.
                                          Suite 2500
                                          Atlanta, GA  30309-3958
                                          Tel: (404) 885-1500
                                          jpozo@seyfarth.com

                                          *Attorneys for Defendant PNC Bank, N.A.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 4th day of October 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

<div style="margin-left:40%">

*s/ Julia H. Pozo*
Julia H. Pozo

</div>