IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| JENNA TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-cv-804 |
| | ) | |
| vs. | ) | |
| | ) | |
| PNC FINANCIAL SERVICES GROUP, | ) | |
| INC, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff, Jenna Turner, brings the within action under Title VII (Count I) and the PHRA (Count II) alleging hostile work environment and constructive discharge against her former employer Defendant, PNC Financial Services Group, Inc. PNC moves for summary judgment. (ECF No. 37). The matter is now ripe for consideration.

After consideration of PNC's Motion for Summary Judgment (ECF No. 37), the respective briefs (ECF Nos. 39, 44, and 48), the respective Concise Statements of Material Fact, Responses, and Appendices (ECF Nos. 38, 40, 45, and 49), the relevant pleadings, and for the following reasons, PNC's Motion for Summary Judgment will be granted.

I. Background[1]

In October 2016, PNC hired Ms. Turner as a Branch Sales and Service Representative at the Great Valley branch. (ECF No. 49 at ¶ 6). On November 11, 2017, she was promoted and transferred to a position as a Branch Sales and Service Associate (BSSA) at the Greensburg

---

[1] For purposes of establishing the factual background, the Court will reference the Defendant's Reply to Plaintiff's Response to Defendant's Concise Statement of Undisputed Facts (ECF No. 49) as it provides a comprehensive recitation of undisputed material facts pertinent to the resolution of PNC's Motion for Summary Judgment.

Eastgate branch (Branch). *Id*. Ms. Turner was pregnant at the time she interviewed and was selected for promotion. *Id*. BSSAs assist customers with account-related inquiries and problems, including opening, closing, and modifying accounts, addressing issues with accounts, opening debit and credit cards, and assisting with applications for lending products. *Id*. at p. 7. Ms. Turner was one of four BSSAs working at the Branch, along with one Lead Teller, four Tellers, and one Branch Sales and Service Representative. *Id*. Tellers and Sales and Service Representatives could help customers with some transactions, but only BSSAs, Assistant Branch Managers (ABMs), or Branch Managers (BMs) could help customers with certain actions related to accounts, cards, and lending products. *Id*.

Ms. Turner enjoyed working at the Great Valley branch before her transfer because the team felt like "family" to her, and she felt very supported by her manager and co-workers. *Id*. at ¶ 8. After transferring to the Branch, Ms. Turner encountered a different atmosphere. *Id*. There, she felt that the employees were "more focused on themselves instead of a team," and her coworkers were always waiting for others to make mistakes so they could point them out to management. *Id*. For example, Ms. Tuner testified:

> Q: So everybody was tracking how long everyone was away from their desk for various reasons?
> A: Yes. It was a very hostile work environment.
> Q: Why do you think that was?
> A: I feel that the branch was more focused on themselves instead of a team. So if there would be moments where the finger was pointed at themselves, then they would be able to counter and say, well, this person did this, and try to make it so that they didn't have to acknowledge their mistake or take credit for what was going on.
> Q: So, overall, you felt like the branch was not a particularly friendly environment just because everyone was out for themselves; is that fair?
> A: Yes.

*Id*.

2

At its branches, PNC emphasizes customer service. *Id*. at ¶ 9. Accordingly, PNC expects an appropriate employee (BSSA or Teller) to meet with customers to address their needs. *Id*. The Lead Teller, Ms. Riggle created a daily "lobby schedule" wherein rotating employees fulfilled the role of "lobby manager," who would marshal customers to the appropriate Branch employee. *Id*. Said schedule included any pre-scheduled breaks where an employee would be away from their desk, such as lunch breaks, as well as pre-scheduled customer appointments. *Id*. If an employee had to step away from her desk for more than a few minutes for an unscheduled break (to take a personal phone call, for example), she was expected to notify Ms. Holts, the Assistant Branch Manager, or whomever was on lobby duty. *Id.* PNC expected employee flexibility regarding break times and delay their breaks if they needed to finish with a customer. *Id*. at ¶ 10. Further, Branch employees could not decline to work with a customer in the minutes leading up to their break simply because their break was approaching. *Id*.

Ms. Turner's second daughter was born February 28, 2018, and she was on a leave of absence from that date until June 20, 2018. *Id*. at ¶ 11. The then-BM, Matthew Schnorr, was transferred effective June 11, 2018, and Ms. Bradish became BM effective July 9, 2018. *Id*. Between June 11 and July 9, Ms. Bradish alternated her time between her previous branch and the Branch. *Id*. at ¶ 12. After July 9, Ms. Bradish continued to spend some time at her previous branch, though she spent the majority of the week (approximately four days/week) at the Branch. *Id*. Ms. Holts, the assistant branch manager, was not assigned any additional personnel duties (such as the power to hire, fire, or discipline employees) between when Mr. Schnorr departed and when Ms. Bradish started working at the Branch fulltime. *Id.*

On June 20, 2018, when Ms. Turner returned from her leave of absence, she discussed with Ms. Holts about her need to express breastmilk during the day. *Id*. at ¶ 13. Ms. Turner

initially asked Ms. Holts to express milk at around 11:00 a.m. and 2:00 p.m., but because Ms.

Holts had reservations about Ms. Turner's absence during the lunch rush, they ultimately agreed

that Ms. Turner would express around 10:45 a.m. and then again at 2:00 p.m. *Id*. They also

discussed and agreed that Ms. Turner would need to be flexible regarding her break time, based

upon customer needs. *Id*. Like all Branch employees, Ms. Turner was expected to finish with any

customer she was servicing before starting a break. *Id*.

The Branch has two restrooms, one of which is a "single stall" (i.e., a small, separate

restroom with only one toilet and a sink), with a lock. *Id*. at ¶ 15. Ms. Turner used the single

stall restroom to express milk, as it was large enough to bring a chair in from the employee

breakroom across the hall. *Id*. Ms. Turner testified that she did not like using the restroom

because people would knock on the door inquiring when she would be done, and she felt

"uncomfortable" having to explain to her co-workers why she had taken so long in the restroom.

*Id.* at ¶ 16.

During Ms. Bradish's first week at the Branch, Ms. Turner informed her that she felt that

other employees resented the additional breaks. *Id.* at ¶ 17. However, Ms. Turner did not report

any derogatory comments or harassment by her coworkers. *Id*. Ms. Bradish advised Ms. Turner

that taking time to pump was natural and that she would absolutely have the break time she

needed. *Id*. At Ms. Turner's request, she and Ms. Bradish addressed her breaks during a morning

"Quick Start" meeting in early July, informing Branch employees that Ms. Turner was entitled to

take breaks to pump, and she did not have to inform anyone other than Ms. Bradish or Ms. Holts.

*Id*.

On July 12, 2018, Ms. Turner called the Employee Relations Information Center (ERIC)

to report that Ms. Holts would at times ask her to take "one more client" before going on break,

and when Ms. Turner returned, Ms. Holts would state "you've been gone for 15 or 20 minutes" and then ask her to "do things." *Id*. at ¶ 21.  At that time, Ms. Turner informed the Employee Relations (ER) Consultant that Ms. Bradish had just held a meeting with the Branch employees, during which she had discussed Ms. Turner's right to take breaks. *Id*.  She further informed the ER Consultant  that "some people" had made jokes after the meeting, and when the ER Consultant asked about the jokes, Ms. Turner told her that it was "one of her friends" who told her that she just wanted to make sure Ms. Turner "was relaxed." *Id*.  Ms. Turner also testified that two coworkers commented in July 2018 about her expressing milk, but they ceased when she told them she did not find such comments funny. *Id*.  Because Ms. Turner informed the ER Consultant that Ms. Bradish had just held a meeting with the Branch to address her concerns, the ER Consultant advised Ms. Turner to wait to see whether things changed at the Branch.  *Id*.  The ER Consultant encouraged Ms. Turner to contact ERIC if things did not improve.  *Id*.

On July 19, 2018, Ms. Turner again contacted ERIC to report comments made by fellow BSSA, Clarissa Peterson.  *Id*. at ¶ 24.  Ms. Turner asserts that Ms. Peterson commented about her pumping breaks, such as "there's no need for you to take that long of a break," "you're milking the system," or "it's not fair that you are able to just go whenever without telling anyone." *Id*. at ¶ 23.  Ms. Turner reported to ERIC that that Ms. Bradish had previously told the Branch that Plaintiff did not need to tell anyone other than Ms. Holts or Ms. Bradish when she was taking a break, but that Ms. Peterson made the comment anyway.  *Id*. at ¶ 24.  On the same call with ERIC, Ms. Turner reported that her "leaving and expressing milk" had gotten better since her July 12 call. *Id*.

On July 24, 2018, ER Consultant, Justina Baum, reached out to Ms. Turner to schedule a follow-up.  *Id*. at ¶ 25.  On August 9, 2018, Ms. Baum and Ms. Turner connected by telephone.

*Id*. Ms. Turner informed Ms. Baum that Ms. Bradish had been "very understanding and accommodating" of her need to take breaks to express milk.  *Id*. She also stated that Ms. Bradish had attempted to manage the situation with Ms. Peterson, and that Ms. Bradish had suggested calling ERIC.  *Id*.  Ms. Turner confirmed to Ms. Baum that she could take her scheduled breaks to pump and that sometimes she would have to go a little later than planned.  *Id.* At the end of the call, Ms. Turner told Ms. Baum that she "was not seeking a resolution," as she was looking for another position at PNC because she did not feel "supported" by anyone at the Branch other than Ms. Bradish.  *Id*.

Ms. Turner testified that any issues with Ms. Peterson were addressed after her call to ERIC and Ms. Bradish talking to Ms. Peterson, though Ms. Peterson started making comments again how Ms. Turner's schedule impacted  Ms. Peterson's schedule.  *Id*. at ¶ 28.  Ms. Turner again spoke to Ms. Bradish, and Ms. Bradish talked to Ms. Peterson.  *Id*. Ms. Peterson stopped making the comments and eventually stopped speaking to Ms. Turner. *Id*.

Between August 12 and 15, 2018, Ms. Turner developed mastitis in one of her breasts and was hospitalized.  *Id*. at ¶ 32. On August 20, 2018, Ms. Turner and Ms. Holts argued because a customer was waiting for service and Ms. Holts was attempting to locate Plaintiff to help the customer. *Id*. at ¶ 33.   After locating Ms. Turner, Ms. Holts asked her to assist the customer, but Ms. Turner refused, stating that she needed to go on break.  *Id*.  Ms. Holts became frustrated, as she felt that Ms. Turner had sufficient time to finish with the customer before taking her break. *Id*.  They both raised their voices as they argued over whether Ms. Turner would help the customer.  *Id*.

Ms. Holts then entered Ms. Bradish's office to complain about the incident.  *Id*. at ¶ 34. Shortly after Ms. Holts went into Ms. Bradish's office, Ms. Turner entered the office. *Id*. Ms.

Bradish told Ms. Turner to take her break. *Id.* Ms. Bradish then reached out to ERIC to seek advice as to how to address Ms. Holts. *Id*. Ms. Bradish and the ER Consultant agreed that Ms. Bradish would coach Ms. Holts about the incident. *Id*. Ms. Bradish explained to Ms. Holts that, even though she correctly requested Ms. Turner to assist the customer, it had been unprofessional for her to raise her voice on the sales floor where customers and other employees could hear. *Id*.

Ms. Turner also reported this incident with Ms. Holts to ERIC. *Id*. at ¶ 35. Ms. Baum followed up with Ms. Bradish, who told Ms. Baum on August 27, 2018 that she had coached Ms. Holts about her behavior as she had been unprofessional. *Id*. Ms. Baum followed up with Ms. Bradish on September 25 to confirm she had coached Ms. Holts about her conduct. *Id*.

Soon after the August 20 incident, Ms. Bradish observed, for the first time, that Ms. Turner had been using the bathroom to express milk. *Id*. at ¶¶ 36-37. Ms. Turner admits that she never spoke with Ms. Bradish about the fact that she was pumping in the restroom, but that she "assumed" Ms. Bradish knew. *Id*. Mr. Turner testified that, in late August, she told Ms. Bradish that she had spoken to an attorney and that she should not be pumping in the restroom. *Id*. at ¶ 38. This was the first time Ms. Turner expressed unhappiness to Ms. Bradish or anyone else at PNC (including Ms. Holts and ERIC) about the fact that she was pumping in a restroom. *Id*. Upon discovering that Ms. Turner was pumping in the restroom, Ms. Bradish arranged for her to express milk in Ms. Bradish's office. *Id*. at ¶ 39. Blinds were installed within a few days, and Ms. Turner immediately began using Ms. Bradish's office for her breaks, which continued through the end of her employment with PNC. *Id*. Ms. Turner testified that Ms. Bradish never gave her a "hard time" about pumping and that she was "understanding and accommodating" of her need to take breaks to pump. *Id*. at ¶ 41. By the time she had moved

into Ms. Bradish's office for breaks, Ms. Turner's coworkers were no longer commenting to her about her breaks and were "just ignoring" her. *Id*. at ¶ 42.

On September 21, 2018, Plaintiff resigned her position with PNC. *Id*. at ¶ 43. In her resignation letter, Ms. Turner stated that her relationship with Ms. Bradish had been "professional, warm and rewarding," that she had the "utmost respect" for Ms. Bradish and wished "nothing but the best for [her] and the branch." *Id*. at ¶ 43. Ms. Turner told Ms. Bradish that she was resigning because she would be working at her daughters' daycare and would receive a discount on their tuition. *Id*. Ms. Turner also testified she resigned because although she was getting her breaks as needed and had been pumping in Ms. Bradish's office since August, she felt like a "black sheep" because her coworkers would not engage with her and she was not "excited" to go to work anymore. *Id*.

PNC now moves for summary judgment contending that Ms. Turner cannot establish a claim of hostile work environment because she cannot demonstrate that the alleged harassment was objectively severe or pervasive and/or that she cannot demonstrate respondeat superior liability. It further argues that Ms. Turner cannot establish her constructive discharge claim.

## II. Standard of Review

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted). Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit. *Id.* In reviewing and evaluating the evidence to rule upon a

motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted). However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law. *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 256-57 (internal citation omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of the party." *Id.* at 251 (internal citation omitted).

III. Discussion

A.  Hostile Work Environment Claim

PNC contends that Ms. Turner cannot establish a claim for a Title VII or PHRA hostile work environment claim[2] because she cannot show that the alleged harassment was objectively

---

[2] Claims under the PHRA are interpreted coextensively with Title VII claims. *Atkinson v.*

severe or pervasive, she cannot establish a detrimental effect, and she cannot establish a basis for respondeat superior liability.  In order to establish a prima facie hostile work environment claim, a plaintiff must show: (1) intentional discrimination based on her sex; (2) severe or pervasive conduct; (3) a detrimental effect on the plaintiff; (4) a detrimental effect on a reasonable person in similar circumstances; and (5) the existence of respondeat superior liability.  *Chinery v. Am. Airlines*, 778 F. App'x 142, 145 (3d Cir. 2019).   PNC specifically argues that Ms. Turner cannot establish the second, fourth[3], or fifth elements of a prima facie hostile work environment claim.

     1.   Severe or Pervasive Conduct

     PNC contends that Ms. Turner cannot reasonably argue that the alleged harassment was sufficiently severe or pervasive to alter the terms of her employment.  Ms. Turner generically argues otherwise.   For purposes of PNC's Motion, the parties do not dispute the conduct alleged by Ms. Turner.  The dispute rather lies with whether said conduct meets the severe and pervasive element of a hostile work environment claim.

     In support of her claim, Ms. Turner identifies the following actions: 1) being required to pump in a private restroom until August 2018; 2) delaying her breaks when she needed to attend to a customer or finish a transaction with a customer; 3) having to notify Ms. Holts or Ms. Bradish when leaving to take a break; 4) coworkers accusing her of not being willing to take customers and "abusing the system;" 5) an argument with Ms. Holts on August 20, 2018 about taking a customer before her break; 6) sporadic comments by a coworker, Clarissa Peterson, starting a few weeks after she came back from leave, and stopping after Ms. Bradish spoke to her about them; and 7) sporadic comments by co-workers about their frustration with Ms. Turner's

---

*LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).
[3]PNC's Brief in Support of its Motion for Summary Judgment includes a sentence to this effect, but the body of the Brief contains no distinct argument regarding the fourth element. Accordingly, the Court will not address said element of the hostile work environment claim.

use of the restroom, and eventually being ignored by her co-workers.  (ECF No. 49 at  ¶¶ 14, 16, 18, 23, 26, 34, 35, 42, 44).

Under the second element of hostile work environment, a plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S.17, 21 (1993).  In determining whether harassment meets this high standard, the Court considers the "totality of the circumstances...including the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interfere[d] with [Plaintiff's] work performance." *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 577 (E.D. Pa. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted); *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006) (stating that "[Title VII] prohibits severe or pervasive harassment; it does not mandate a happy workplace.") (overturned on other grounds).  And the Court should consider what is objectively hostile, i.e., what a reasonable person in the same position as Plaintiff would find to be hostile, not just what Plaintiff subjectively believed was hostile. *Forklift Sys.*, 510 U.S. at 21; *Greer*, 590 F. App'x at 173; *Stewart v. Weis Markets*, 890 F. Supp. 382, 389 (M.D. Pa. 1995) (stating that "[n]either Title VII nor the PHRA is designed to protect the overly sensitive plaintiff.").

Several courts have applied these standards to cases involving breastfeeding employees and granted summary judgment in favor of employers.  Those courts have found no severe or

pervasive harassment in similar circumstances to those alleged by Ms. Turner, namely expressing locations, interruptions while expressing, and complaints by coworkers regarding the inconvenience of her pumping in the restroom. *See, e.g., Winder v. TriCounty Med. Equip.*, 2020 WL 4211538, at *8-9 (E.D. Pa. Jul. 23, 2020) (finding that questions from co-workers about why the plaintiff needed to pump, and being denied room to pump in, which resulted in her soiling her shirt, did not rise to the level of severe or pervasive harassment); *Hicks v. City of Tuscaloosa*, 2015 WL 6123209, at *12 (N.D. Ala. Oct. 19, 2015) (finding no hostile work environment where, among other things, the plaintiff alleged that she was forced to be on full duty while pregnant, was written up by her supervisor, was pressured to take less than 12 weeks of maternity leave, and forced to express milk in a public locker room); *Falk v. City of Glendale*, 2012 WL 2390556, at *4 (D. Col. Jun. 25, 2012) (finding no hostile work environment when the plaintiff was unable to take breaks to express milk, leading to three separate breast infections; was frequently interrupted while taking breaks; and a co-worker made a "moo" noise when the plaintiff requested a break); *Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315, 322-25 (D. Del. 2019) (finding no reasonable juror could find a hostile work environment based on the fact that plaintiff's coworkers would enter the office where she was pumping, a coworker peeked into the office and made a squeezing motion while she was pumping, and that the office had an uncovered window and surveillance camera; and because her supervisor and coworkers made comments about her pumping and how it inconvenienced them, then ultimately stopped speaking to her); *Page v. Trustees of University of Pennsylvania*, 222 F. App'x 144, 146-47 (3d Cir. 2007) (affirming summary judgment determination that a supervisor's interruption of plaintiff's milk expressing and supervisor assigning plaintiff insignificant tasks not assigned to non-breastfeeding officers, was not objectively offensive).

Here, the Court agrees that, under the prevailing case law, no reasonable juror could find that the alleged conduct was sufficiently severe or pervasive to alter the conditions of the Ms. Turner's employment and create an abusive working environment.   First, with regard to delayed breaks and not being provided an appropriate space for expressing, Title VII does not require PNC to provide an employee with a time and private location unless the accommodation is provided to non-pregnant employees.  *See Lampkins*, 383 F. Supp. 3d at 328-29; *Dudhi v. Temple Health Oaks Lung Center*, CIVIL ACTION No. 18-3514, 2020 WL 996915, at *7 (E.D. Pa. Mar. 2, 2020) (failure to provide accommodation to employee to express milk at work cannot form basis of Title VII claim because she could not show that similarly situated non-breastfeeding employees were treated more favorably than her).   In the position that Ms. Turner held, all BSSAs, whether breastfeeding or not, also had their breaks delayed when working with customers.   Ms. Turner has produced no evidence or allegation that non-breastfeeding coworkers did not have to delay their breaks while working with customers.   Further, while the Fair Labor Standards Act and other statutes may require employers to provide a break and private location for nursing, Ms. Turner has not alleged a claim outside of Title VII.   The evidence also bears out that issues with timing and location for expressing were not pervasive. PNC never forced Ms. Turner to miss a break, and she told PNC's Employee Relations team in July 2018 that her "issues with leaving and expressing milk" had gotten better, that Ms. Bradish was "very understanding and accommodating" of her need to take breaks, and that she had been able to take her breaks to pump, but would sometimes have to go "a little later than planned." (ECF No. 49 at ¶¶ 24, 25). And with regard to the use a restroom, the same was "single stall" restroom with a lock which afforded Ms. Turner privacy and space to express milk.  *Id*. at ¶ 15. Her initial complaints regarding the use of the restroom did not occur until August 2018, and Ms.

Bradish immediately accommodated by offering her office to Ms. Turner for expressing. *Id*. at ¶¶ 38-39.

With regard to Ms. Holts or Ms. Bradish requiring Ms. Turner to notify them when she would leave for a break, this applied to all Branch employees, and thus, again, Ms. Turner was not treated any less favorably than non-breastfeeding employees. *Id*. at ¶ 9.  Next, with regard to Ms. Holts's alleged comments that Ms. Turner was "abusing the system," the record reflects that this was a one-off  dispute, involving no directed insults or personal comments,  wherein Ms. Bradish quickly resolved the issue. *Id*. at ¶¶ 33-35.   Such isolated incidents and offhand comments are insufficient to support a hostile work environment claim. *See Chinery v. Am. Airlines*, 778 F. App'x. 142, 145 (3d Cir. 2019).  Finally, with regard to comments by coworkers, these can be best categorized, as the "simple teasing [and] offhand comments" rejected by the Supreme Court.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The record reflects that Ms. Turner was not subject to a constant barrage of abusive comments or physically threatening conduct.  Instead, it reflects a workplace driven by service customers needs; a Branch Manager who accommodated Ms. Turner's needs and promptly addressed her complaints; and an un-collegial workplace environment existing regardless of Ms. Turner's breastfeeding status. Therefore, the record reflects that the conduct described by Ms. Turner was not severe or pervasive.   Thus, no reasonable juror could find that Ms. Turner has supported the severe and pervasive element of her hostile work environment claim under Title VII.

2.   Respondeat Superior Liability

PNC next contends, that even if Ms. Turner could support severe and pervasive conduct, she cannot demonstrate respondeat superior liability.

14

Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).   If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. *Id*. In cases in which the harasser is a "supervisor," however, different rules apply. *Id*. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. *Id*. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id*.  at 807; *Ellerth,* 524 U.S. at 765.

PNC primarily argues that Ms. Turner's allege harassers were not supervisors, and Ms. Turner cannot establish that PNC failed to provide a method of reporting or failed to take prompt remedial action.  PNC also maintains that, even if the Court finds that Ms. Holts was a supervisor, PNC took reasonable care to address any alleged harassment and Ms. Turner failed to avail herself of the reporting avenues offered by ERIC.

a.   Supervisor status

PNC contends that Ms. Holts was not Ms. Turner's supervisor under the United Supreme Court's decision in *Vance v. Ball State*. Ms. Turner maintains Ms. Holts qualified as her supervisor.   PNC responds that Ms. Turner's argument relies entirely on the characterization of one of the harassing supervisors in *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) -- apparently ignoring that the *Vance* Court explicitly dismissed that argument.  PNC instead contends that *Vance* and its progeny have held that an individual who can only direct the daily activities of an employee, but cannot take "tangible employment actions against the victim,"

such as hiring, firing, failing to promote, or reassignment with significantly different responsibilities, is not a supervisor in this context.

*Vance* held that an individual is a "supervisor" in a Title VII harassment claim "only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id*. at 431 (quoting *Ellerth*, 524 U.S. at 761). The Court expressly rejected a "second category" of supervisors like Ms. Holts who only have the ability to direct or lead their coworkers' labor, stating that "[t]he ability to direct another employee's tasks is simply not sufficient" to warrant the title "supervisor" for purposes of a Title VII hostile work environment claim. *Id*. at 432. The question of whether an individual is a supervisor can generally be resolved as a question of law. *Id*. at 443. Courts interpreting *Vance* have made clear that an employee who supervises co-workers, conducts training, and manages coworkers' day-to day activities is not a supervisor if they do not have the power to take tangible employment actions. *See Morrow v. Kroger Limited Partnership*, 681 F. App'x 377, 380 (5th Cir. 2017) (finding that department manager not a "supervisor" because while he had some administrative responsibilities such as scheduling and filling out performance evaluations, he could not take a tangible employment action); *Equal Employment Opportunity Commission v. AutoZone, Inc.,* 692 F. App'x 280, 283-84 (6th Cir. 2017) (stating that store manager who could initiate disciplinary process and recommend demotion or promotion not a supervisor because he could not hire, fire, demote, promote, or discipline employees); *Irvins v. Penn. Dep't of Corrections - State Correctional Institute at Graterford*, CIVIL ACTION NO. 17-5777, 2019 WL 653092, at *9 (E.D. Pa. Feb. 15, 2019) (stating that fact that employee trained plaintiff did not make him a

16

supervisor); *Berger v. PA Dept. of Transportation*, No. 5:16-cv-06557, 2018 WL 2943963, at *10 (E.D. Pa. Jun. 13, 2018) (holding that foreman was not a supervisor, even though he was responsible for managing the operators and coordinating relevant projects); *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 696 (E.D. Pa. 2016) (finding that training and supervising other staff members not sufficient to make one a supervisor under Title VII).

Here, the record is clear that Ms. Holts could only direct the daily activities of Ms. Turner as the Assistant Branch Manager, but could not take "tangible employment actions against the victim," such as hiring, firing, failing to promote, or reassignment with significantly different responsibilities. Ms. Bradish testified that as the Branch Manager, she was solely responsible for hiring, firing, disciplining, and performance managing employees at the Branch. (ECF No. 49 at ¶ 3). Ms. Holts confirmed this, stating that she did not have the power to sign off on, or issue, discipline to employees. *Id.* at ¶ 5. Ms. Bradish regularly met with both Ms. Holts and Lead Teller, Kelly Riggle, to discuss Branch operations (including any employee concerns), but Ms. Bradish — who was onsite and interacted with employees on a daily basis — made all disciplinary and performance management decisions herself. *Id.* Ms. Turner provides no evidence to the contrary that would create a genuine issue of material fact as to Ms. Holts ability or inability to take any tangible employment action against Ms. Turner. Therefore, under *Vance*, no reasonable juror could find that Ms. Holts was Ms. Turner's supervisor for purposes of her hostile work environment claim.

    b.   Reporting and Remedial Actions regarding non-supervisors

Because the alleged harassers were non-supervisory coworkers, PNC maintains that Ms. Turner cannot establish that it failed to provide a method for reporting or failed to take prompt remedial action. Ms. Turner contends that, when she complained about Ms. Holts, she was

informed that Ms. Bradish held a meeting with the branch to address Ms. Turner's concerns and advised her to wait to see whether things change at the branch.  Further, she argues that while Ms. Bradish has testified that she counseled Ms. Holts about her unprofessional behavior, Ms. Holts denied that she received any counseling or discipline.   Therefore, Ms. Turner asserts that either Ms. Bradish is not telling the truth or she "counseled" Ms. Holts in such a manner that Ms. Holts did not understand that her treatment of the Ms. Turner was unacceptable. PNC responds that the undisputed facts demonstrate that PNC took reasonable care to address promptly any alleged harassment and that Ms. Turner failed to take advantage of the reporting avenues available to her if any alleged harassment by Ms. Holts continued.

Plaintiff "must demonstrate that the employer was negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." *Bumbarger v. New Enter. Stone & Lime Co., Inc.*, 170 F. Supp. 3d 801, 838 (W.D. Pa. 2016) (citations and internal quotation marks omitted). She can do so only by showing that PNC "failed to provide a reasonable avenue for complaint" or, alternatively, that PNC "knew or should have known of the harassment and failed to take prompt remedial action." *Id*. "[A]n employer knew or should have known about workplace [] harassment if management-level employees had actual or constructive knowledge about the existence of a [] hostile environment." *Huston*, 568 F.3d at 105 (internal citations omitted) (emphasis in original). "Prompt remedial action" is conduct "reasonably calculated to prevent further harassment," even if it does not effectively end the harassment. *Bumbarger*, 170 F. Supp. 3d at 838; *Peace–Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir. 2010) (citing *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006)). "An effective grievance procedure—one that is known to the victim and that timely stops the harassment—shields the

employer from Title VII liability for a hostile environment." *Bouton v. BMW of N. Am., Inc.*, 29

F.3d 103, 110 (3d Cir. 1994).

Here, Ms. Turner has not demonstrated that PNC failed to provide a "reasonable avenue

for complaint," or that it failed to take prompt remedial action of any known harassment.   The

record reflects that PNC maintains a Bias and Harassment Policy that details five avenues for

reporting harassment, and Ms. Turner, as evidenced by her contacting of ERIC and Ms. Bradish,

was clearly aware of those options.  (ECF No. 49 at ¶ 1). Further, after Ms. Turner contacted

ERIC and Ms. Bradish, each took prompt and remedial action.   Ms. Turner testified that Ms.

Bradish acted promptly to address comments by Ms. Peterson, Ms. Holts, and other coworkers.

*Id*. at  ¶¶ 21, 24, 25, 28, 34-35.  Ms. Bradish coached Ms. Holts about the August 20, 2018

incident and took immediate action to allow Ms. Turner to express milk in her office after

learning that she was using the restroom. *Id*. at  ¶¶ 34, 35, 39. Ms. Turner also advised ERIC on

multiple occasions that Ms. Bradish was addressing her concerns.   *Id*. at ¶¶ 21, 25, 26.  Ms.

Turner offers no contrary evidence of record that creates a genuine issue of material fact such

that a reasonable juror could find that PNC did not take prompt remedial action to reasonably

end the alleged harassment.

c.  Affirmative Defense

Finally, PNC argues that even if the Court Finds that Ms. Holts was a Supervisor, it is

entitled to an affirmative defense under *Faragher-Ellerth*.   PNC contends that it exercised

reasonable care to prevent and correct any harassing behavior.   Ms. Turner does not specifically

address PNC's affirmative defense.

Under this defense, "if the harassed employee suffered no tangible employment action, as

in the present scenario, the employer can avoid liability by asserting the *Faragher-Ellerth*

affirmative defense." *Minarsky v. Susquehanna Cty.*, 895 F.3d 303, 310 (3d Cir. 2018). The employer must show "(a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

The reasonableness of the employer's preventative and corrective measures, and the reasonableness of the employee's efforts (or lack thereof) to report misconduct and avoid further harm. *Minarsky*, 895 F.3d at 311. Thus, the existence of a functioning anti-harassment policy could prove the employer's exercise of reasonable care so as to satisfy the first element of the affirmative defense. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275.

To prove the second element of the affirmative defense, that the plaintiff unreasonably failed to avail herself of the employer's "preventive or corrective opportunities," the Supreme Court has held that "proof that an employee failed to [exercise] reasonable care to avoid harm ... will normally suffice to satisfy the employer's burden under the second element of the defense." *Id*. at 807–08, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. An employer can establish the second element by showing that the employee knew about its methods for reporting harassment but failed to use them. *Lauterborn v. R&T Mechanical, Inc.*, 274 F. App'x 137, 139 (3d Cir. 2008).

Here, PNC has established that it maintains a Bias and Harassment policy that provides a number of methods for reporting violations. (ECF No. 49 at ¶ 1). Ms. Turner's was aware of said policy as she called ERIC three times in July and August 2018. *Id*. The record reflects that ER Consultants addressed the issues that Ms. Turner f presented to them. *Id*. at ¶¶ 24, 25, 26, 35.

Ms. Turner also admitted that Ms. Bradish promptly addressed all issues that she reported to her, and that she felt Ms. Bradish was supportive during her employment.  *Id*. at ¶¶ 21, 24, 25, 28, 34, 35, 41, 43.  Moreover, the record reflects that, with regard to the comments made by Ms. Holts, the alleged supervisor, Ms. Turner did not tell ERIC during either of the July 2018 calls that Ms. Holts was harassing her or otherwise creating a hostile work environment. Id., ¶¶ 22, 25. The only mention of comments by Ms. Holts was during the July 12 call, when Ms. Turner stated that Ms. Holts would state when Ms. Turner came back breaks that she had been gone for "15 or 20 minutes." *Id*. at ¶ 21.   As discussed above, such comment was not harassment.   Even if it were harassment, Ms. Turner assured ERIC that Ms. Bradish addressed the issue. *Id*. at ¶¶ 24,25. With regard to any further complaints alleged by Ms. Turner, she did not make any further complaints to ERIC or Ms. Bradish.   Therefore, the record sets forth that PNC exercised reasonable care to prevent and correct promptly any sexually harassing behavior and that Ms. Turner failed to take advantage of any preventive or corrective opportunities provided by PNC. Thus, a reasonable juror could find that PNC could support an affirmative defense under *Faragher-Ellerth* , which defeats the respondeat superior element of Ms. Turner's hostile work environment claim.

Accordingly, on both the merits and under the *Faragher-Ellerth* affirmative defense, PNC's Motion for Summary Judgment, as regard the Respondeat Superior element of Ms. Turner's Hostile Work Environment claim, will be granted.   And because Ms. Turner cannot support the second and fifth elements of a hostile work environment claim under Title VII or the PHRA, PNC's Motion for Summary Judgment on said claim will be granted.

B.  Constructive Discharge Claim

PNC also argues that Ms. Turner cannot establish a claim of constructive discharge because she failed to exhaust her administrative remedies with regard to said claim.  In response, Ms. Turner has withdrawn her constructive discharge claim.   Accordingly, PNC's Motion for Summary Judgment, as regards Ms. Turner's constructive discharge, will be granted.

IV. Conclusion

Based upon the foregoing, PNC's Motion for Summary Judgment, with regards to Counts I and II, will be granted.  Judgment will be entered in favor of PNC and against Ms. Turner.  A separate order will follow.

**Dated:** this 25th day of January 2022.

Marilyn J. Horan
United States District Judge